RECEIVED
IN ALEXANDRIA, LA

JUN 3 0 2009

TONY R/MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

AVOYELLES PARISH SCHOOL BOARD     CIVIL ACTION NO. 08-1374

VERSUS                    DISTRICT JUDGE JAMES T. TRIMBLE

UNITED STATES
     DEPT. OF INTERIOR, et al    MAGISTRATE JUDGE JAMES D. KIRK

(REVISED[1])
<u>REPORT AND RECOMMENDATION</u>
on Shortest and Best Route Issue
With Reduced Time for Objections

Before the court is a motion for summary judgment filed by Le Chevalier, Inc., doc. **#108,** a motion for summary judgment filed by the Avoyelles Parish School Board, doc. **#112,** and a motion for summary judgment (on Phase II), doc. **#72,** filed by Elder Properties. All of the motions have been referred to me by the district judge for report and recommendation. A hearing was held following which the court requested that the evidence be supplemented. Additional evidence has been filed and the case is ready for decision.

This is a suit for a servitude of passage under Louisiana law (access easement) to an enclosed estate filed by the Avoyelles Parish School Board (the school board), owner of the enclosed

---

[1] The Report and Recommendation issued June 29, 2009 has been vacated. This revised Report and Recommendation correctly identifies one of the bodies of water located on Section 16 as Lac Long, not Bayou Natchitoches.

estate. The property is described as all of Section 16, Township 2 North, Range 6 East, Avoyelles Parish, Louisiana and has, in the past, been used for hunting and other recreation[2]. As required by Louisiana law, plaintiff sued all of the contiguous landowners, being Elder Properties (Elder[3]) on the north and west, the United States and the Arnouville et al defendants (Arnouville) on the east, and Le Chevalier, Inc.[4] (Le Chevalier) on the south.

According to the school board, access to the school board's land was historically by way of Louisiana Highway 452, which everyone agrees is a public road. From the end of Highway 452, access was by way of the continuation of the same road, which continues as an unpaved road known as White Horse Road[5] to the first intersection, locally known as "first crossing", then by way of the continuation of the same road which from that point is

---

[2] As the government has helpfully explained in 08-1364, Section 16 of every township was reserved by the United States for the support of the schools prior to Louisiana's statehood. The State, through the parish school boards, holds Section 16 lands in trust for the benefit of public education. Ebey v. Avoyelles Parish School Board, 861 So.2d 910 (La. App. 3d Cir. 2003).

[3] In this Report, Elder will also refer to the predecessors in title to the current owner which were various family members and family companies.

[4] On the attached plat, the Le Chevalier lands are shown identified as "La Nuit, Inc."

[5] This portion of the road is also sometimes called Lac Long Road or Lake Long Road since the road is one continuous stretch of road.

mostly[6] known as Lac[7] Long Road or Lake Long Road, then to Buck or Bucks or Buck's road to the property of plaintiff. Elder disputes that public access through its lands was ever allowed but admits that historically it allowed the school board to access through Elder property for necessary purposes.

Plats of Section 16 and the surrounding properties were attached to the Report and Recommendation, doc. #99. A plat is also attached to this Report and Recommendation.

Specifically, the access roads--Highway 452, Lac Long Road, and Buck Road-historically ran through property acquired in 1988 by the United States through the Fish and Wildlife Service for use as the Lake Ophelia Wildlife Refuge and then Buck Road continued through the government's property in Sections 3 and 10 and then entered the Elder property on the east side, before continuing to the north boundary of the school board's land in Section 16. There is evidence in the record that the road historically continued on to the community of Bordelonville by way of a bridge over Bayou Jeansonne which is southeast of the subject property. At some point in the past, the roadway, as a route to Bordelonville was

---

[6] Counsel have suggested that some "locals" may refer to it, or a portion of it, as White Horse Road. The road is one continuous road but, perhaps, referred to by different names in different parts, by different people.

[7] "Lac" means "lake" in French. The area of the state surrounding and including the area which is the subject of this suit is of French heritage.

abandoned. Since then, the bridge has been repeatedly burned.

In 1993, agents of the refuge began restricting access along Buck Road through the refuge's Section 10 lands. Elder and others filed suit in this court[8] which suit resulted in a compromise agreement whereby Section 10 remained closed to access but the refuge granted Elder a servitude 20 feet wide from Buck Road near the southern boundary of Section 3 along the southern boundaries of Sections 3 and 4 to the point where the new road entered Elder's Section 9 land near its northeast corner.[9] The new road was referred to in the compromise agreement and, in this proceeding too, as the "dog leg". About six years ago, Elder put up a gate on the dog leg road where it entered his land near the northeast corner of Section 9 and, from that time, he denied the school board access to its land in Section 16 through his property. Because Elder had cut off access, and as an accommodation to the school board, the United States allowed the school board to allow persons accessing school board land in Section 16 to park their vehicles near the southern boundary of Section 3 on U. S. government property and from there to drive their ATV's[10] through Sections 10

---

[8] Elder Properties, et al v. United States, et al, docket number 94-1408.

[9] A map of this route is attached to the compromise agreement in the record of that case in this court.

[10] An ATV is an all-terrain vehicle or "four-wheeler" which is a golf cart-sized vehicle with low-pressure tires and handlebars

and 15 lands owned by the government, in order to access the Section 16 land. Use of other vehicles was still prohibited. When a new refuge manager came along about two years ago, the Fish and Wildlife Service chose to deny the school board access through its lands even by way of ATV's. Because the school board then had no access whatsoever to its land, and no way to use its land, this suit was filed and timely removed to this court. The court then bifurcated the question of access[11] into the issues of 1) what roads are public in the area of the subject land, 2) the shortest and/or best route, and 3) damages, if any. See Order dated March 24, 2009, doc. #64. As mentioned, a Report and Recommendation was issued on the public roads issue, doc. #99 which the district judge adopted. The public road issue is now before the district judge for decision.

### The Law of Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure mandates that a summary judgment:

> "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, [submitted concerning the motion for summary judgment], if any, show

---

like a motorcycle and is used to traverse a wider variety of terrain than most other vehicles can handle.

[11] See La. CC. Art 689.

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

Local Rule 56.2W also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must be satisfied that no reasonable trier of

fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 178 (5th Cir.1990) ( citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. See Celotex, 477 U.S. at 325, 106 S.Ct. 2548; see also Lavespere, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. See Celotex, 477 U.S. at 324, 106 S.Ct. 2548. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. See id. at 325, 106 S.Ct. 2548; Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994); Austin v. Will-Burt Company, 361 F. 3d 862, (5th Cir. 2004). This burden is not satisfied with "some metaphysical doubt as to the material facts," by "conclusory allegations," by "unsubstantiated assertions," or by only a "scintilla" of evidence.

Little, id.

All evidence must be considered, but the court does not make credibility determinations. If the movant fails to meet its initial burden, summary judgment should be denied. Little, 37 F.3d at 1075.

## The Law of Enclosed Estates

Louisiana law with regard to the right of access to an enclosed estate is found in La. CC Art's. 689 to 696 and the jurisprudence interpreting and applying those rules.

Article 689 provides:

> The owner of an estate that has no access to a public road may claim a right of passage over neighboring property to the nearest public road. He is bound to indemnify his neighbor for the damage he may occasion.

The legal servitude of passage is predicated on necessity. The test is satisfied when an estate has no access or the access is insufficient for the needs of the estate. See Yiannopoulos, *La. Civil Law Treatise, Predial Servitudes*, §93 (2d Ed. 1997). A "public road" is any place that is open to vehicular traffic by members of the general public, even if the public is unlikely to use the road except to go to a particular place, and maintained by the public. Kavanaugh v. Bowers, 826 So.2d 1165 (La. App. 5th Cir., 2002), writ den. 828 So.2d 575 (La. 2002); La. CC Art 457.

Article 690 provides:

> The right of passage for the benefit of an enclosed estate shall be suitable for the kind of traffic that is reasonably necessary for the use of that estate.

Therefore, the scope of the right of way is determined by the

8

actual needs of the enclosed estate. <u>Davis v. Culpepper</u>, 794 So.2d 68 (La. App. 2nd Cir. 2001, writ den. 804 S.2d 646 (La. 2001). The owner of the enclosed estate may thus construct on the right of way the kind of road reasonably necessary for the exercise of the right of way. La. CC Art. 691.

Article 692 provides:

> The owner of the enclosed estate may not demand the right of passage anywhere he chooses. The passage *generally* shall be taken along the shortest route from the enclosed estate to the public road at the location least injurious to the intervening [servient estate] lands. (Emphasis added.)

The term "generally", as used in the article is an acknowledgment that there are exceptions to the rule that the passage shall be taken along the shortest route to the public road. Two of the exceptions were recognized in <u>Davis v. Culpepper</u>, supra: first, where the estate that provides the shortest route is covered by water or is otherwise not accessible year-round and, second, where the costs associated with crossing the estate which provides the shortest route makes it economically unfeasible. Although <u>Davis</u> recognized only those two exceptions, other cases have applied other considerations in determining the best route, even if it is not the shortest. For example, some cases have considered whether the route is the route which has historically been used to gain access to the property. See <u>Bailey v. McNeely</u>, 918 So.2d 1124 (La. App. 3d Cir. 2005); <u>Bouser v. Morgan</u>, 520 So.2d 937 (La. App. 3d Cir. 1987); <u>Martini v. Cowart</u>, 23 So2d 655 9 La. App. 1945);

9

Braxton v. Guillory, 721 So.2d 114 (La. App. 3d Cir. 1998). Others have considered the fact that a particular route might bifurcate the servient estate. See Pearson v. Theriot, 534 So2d 35 (La. App. 3d Cir. 1988). No doubt there are other conceivable and valid exceptions which the Davis court did not envision. Some possible exceptions come readily to mind, for example the fact that a proposed route would traverse a military base or other sensitive government compound or where, for example, the route would cross through a nuclear facility. The point is that there may be numerous reasons a shorter route might legitimately be rejected in favor of a longer route, other than the two situations recognized in Davis.

Some Louisiana cases recite a simple formulaic approach to determining where a servitude of passage should be located, by suggesting that, first, the shortest distance should be determined and only then should a balancing test be utilized to determine where on the servient estate the servitude should lie. See, e.g. Davis, supra at p.74; May v. Miller, 941 So.2d 661 (La. App. 3rd Cir., 2006) at p. 666. This is the approach urged by Elder, through counsel.[12]

---

[12] As will be seen, the instant case illustrates the impossibility of applying such a rule literally. For here, the shortest route traverses two landowner's tracts—Le Chevalier and Arnouville. Applying the formulaic approach suggested by Elder (that the court must first determine which property provides the shortest route and place the servitude on that property) the court would, I presume, be bound to place the servitude at some location where it would fall on both the Le Chevalier and the Arnouville tracts, an obviously impracticable-indeed impossible-approach. The

Nevertheless, the cases, including the two cited ones, do not apply such a ritualistic matrix but instead consider whether a route other than the shortest route may be preferred. See Davis, supra at p. 74; May, supra, p.667; even if it is not the estate providing the shortest route, see Cash Point Plantation Equestrian Center, Inc. v. Shelton, 920 So.2d 974 (La. App. 2d Cir. 2006). The true test has been stated as requiring the court to consider not only distance, but also the least injury to the servient estate and the most practicable way. Mercer v. Daws, 186 So.2d 877 (La. App. 1939). Stated differently, even if not the shortest, the route chosen might well provide the most practical, feasible and aesthetic resolution possible. Bailey v. McNeely, supra. Thus, considerations other than distance, such as cost, convenience, and practicality must be considered in determining the placement of a servitude. Watts v. Baldwin, 662 So.2d 519 (La.App. 1st Cir., 1995) (citing Brown v. Terry, 103 So.2d 541, 548 (1st Cir. 1958), and Tessier v. Medical Center of Baton Rouge, Inc., 636 So.2d 928 (1st Cir. 1994)).

The burden of proof is on the dominant estate seeking to show that a route other than the shortest route is the most feasible, or best, route for the placement of the servitude. Cash Point Plantation, supra.

_____

Cash Point case (infra in main text above) makes clear that the servitude may, for good reasons, be placed on an estate that does not provide the shortest route.

11

## The Law of Public Roads

As stated above, La. Civil Code Article 457 provides that a public road is one that is subject to public use. Professor Yiannopoulos has explained that, in modern times, "it became settled that the public may acquire in Louisiana an interest in the land on which a road is built or in the use of a road in a variety of ways. Thus, the public may acquire land or a servitude for the construction and maintenance of a public road by one of the methods of the Civil Code by which ownership or servitudes are acquired, including purchase, exchange, donation, expropriation and prescription. Most frequently, however, the public acquires an interest in a road by dedication." See Yiannopoulos, *La. Civil Law Treatise, Property*, §62 (2d Ed. 1980).

Professor Yiannopoulos lists several ways a road can be dedicated: 1) formal dedication by written act, 2) implied dedication by clear offer and acceptance, 3) statutory dedication under LSA-R.S. 33:5051, and 4) tacit dedication pursuant to LSA-R.S. 48:491. In addition, the professor explains that, in the case of a river road, there might exist a legal servitude and, finally, a road might be acquired with 30 years use by acquisitive prescription. La. CC Arts. 740, 742.

The professor's analysis clearly is concerned with acquisition of land or a servitude for a public road. However, the court notes, that at least for one limited purpose, a road has been considered

public without regard to whether there is ownership of the bed of the road or even a servitude. Specifically, it has been held that a particular road on private property might be considered to be a "public road" for purposes of application of Louisiana's non-resident motorist law. See <u>Galloway v. Wyatt Metal and Boiler Works</u>, 181 So. 187 (1938).

Important to this case, is the Louisiana Supreme Court's decision in <u>Vermillion Parish School Board v. Broussard</u>, 270 So.2d 523 (La. 1972) in which Justice Barham noted that, for purposes of determining a right of access to an enclosed estate, a road might be considered to be "public" even though it is not a "public road" subject to use by the public at large.[13]

## Analysis

The issue presented by motions in this phase of the case is what is the shortest and "best" route to the nearest public road. Once again, the issue of which is the nearest public road, and the applicability, *vel non*, of the <u>Broussard</u> and <u>Kavanaugh</u> decisions is before the district judge. Obviously, his decision very much affects which route is shortest and/or "best".[14]

---

[13] This is particularly important here, where the United States admitted during oral argument on the motions that it has never denied access to, or required a permit from, members of the general public for use of Lac Long Road.

[14] If, for example, Buck's Road, including the dog-leg, is found to be public, then the plaintiff is not land-locked.

The parties have suggested several potential routes to the school board's Section 16 lands.

1) First, all parties admit that the shortest route is a straight line from the southeast corner of Section 16 to Bayou Natchitoches Road, a public road. This route would traverse the Le Chevalier property south of Bayou Natchitoches, and the Arnouville property to the north and east of the bayou. This route, however, poses several problems. First, it traverses low and possibly wetlands type land. Second, it would require construction of an approximately 120 foot long bridge to span Bayou Natchitoches at a cost, according to the engineer, Lachney, of over $700,000. Because Bayou Natchitoches is navigable, construction of a bridge would require a permit from the U. S. Army Corp of Engineers, a potential bureaucratic nightmare. The route would require clearing of timber and the construction of a new roadway from scratch with extensive elevation and drainage work and would enter Section 16 in its smaller tract east of Lac Long which bifurcates the school board property. Thus the route would then require the construction of a second bridge on the lands of the school board in order for it to gain appreciable use of its land.

Therefore, all parties agreed at oral argument that this route, although the shortest one, is simply not feasible, primarily because of cost. The undersigned concurs.

2) The parties also agree that the only other potential route

14

on the Le Chevalier lands, and the second longest of the potential routes that have been proposed, is also not feasible. That is the Knight Oil Tools Road which crosses the Le Chevalier lands in Sections 21, 22, and 27 from Bayou Natchitoches Road north to plaintiff's Section 16 lands. The terrain is similar to the first route but the lands are protected by an 8 ½ foot security fence, gated and would require a bridge over Bayou Jeansonne in Section 16 in order to use the bulk of the Section 16 lands. The road is a dirt with gravel road used for hunting access by Le Chevalier which turns into a trail prior to intersecting the southern boundary of Section 16, the school board's lands. The road would enter in a very small triangle of land due to the intersection Bayous Natchitoches and Jeansonne, as is apparent from the attached plat. Such a route would not gain meaningful access to the school board's lands. A right of passage shall be suitable for the kind of traffic that is reasonably necessary. LSA-CC 690.

The court agrees with the parties that the Knight Oil Tools Road is impracticable.

3) A route which is the second shortest, being about a thousand feet shorter than the Knight Oil Tools Road route just discussed, is Pug's Road, which traverses the property of "Pug" Arnouville, and of Guillot and Roblin. The route would begin at the road's intersection with Bayou Natchitoches Road in Section 14, would cross Bayou Natchitoches by way of a public, though

15

substandard, bridge and would continue through cultivated farmland to the easternmost boundary of Section 16 in its southeast quarter of the southeast quarter. This route is one of two (the other being the refuge- Elder property route discussed next) which offers potential as a servitude for access to Section 16.

While there is much evidence in the record and there was discussion at the hearing as to the adequacy of the bridge, which I will refer to as "Pug's Bridge"[15] for clarity, and as to its character as public or private, it is clear that the bridge is public. This is shown by the official records of the Avoyelles Parish Police Jury. Therefore, all of the evidence and discussion regarding whether the bridge needs to be replaced or upgraded and the cost to do so, is irrelevant. The cost and responsibility would not be the school board's but rather would be the Police Jury's.[16]

Pug's Road is simply a farm implement road as shown by the photographs in the record. The road follows, more or less, the southern boundaries of the Roblin and Guillot properties for a

---

[15]  The bridge is bridge number P0531089915001 on the official records of the Avoyelles Parish Police Jury and is referenced as "Grassy Lake bridge", "Chatelain bridge", and, once, as "Wolf Pra [probably Wolf Prairie] bridge".

[16]  The photographs show very clearly that the bridge is substandard, though admittedly the state has posted it for 40 ton traffic. Mr. Willis, Elder's engineer took a photograph of an eighteen wheeler on the Arnouville property. It would have to have crossed Pug's bridge to get there. Had the driver glanced under the bridge, or had he had access to the photographs in the record here, perhaps he would have thought twice about driving his eighteen wheeler across it.

16

short distance and then meanders in a southeasterly direction across the cultivated farmland of Arnouville, bisecting the farm, before terminating at the eastern boundary of Section 16. The road has never been used as a public road but only by Roblin, Guillot and Arnouville to access their respective properties.[17] It would need to be improved to the tune of about $113,000 dollars, according to the estimate made by Elder's engineer, Mr. Willis. The land, while cleared farmland, is nevertheless low land and subject to periodic flooding.

The parties agreed that using the existing Pug's road is the best route on the Arnouville property and, because the farmland is low, it would not make sense to traverse the property at another location.

This route (as well as any possible route through the Arnouville property) enters the small parcel of the school board's property; not the small triangle mentioned above, but the property east of Lac Long, and thus would not provide access to the larger tract of the school board's property unless a bridge were to be built on the school board's lands to cross Lac Long.[18]

---

[17] It was suggested at oral argument that the road was used once for logging operations on the school board's property. It was also pointed out that the Elder route, the longest of the potential routes which will be discussed infra, was also used at the same time for the same purpose. This, however, is not evidence before the court.

[18] It was pointed out at the hearing that the camps which are on the school board's property are all, except for one, located on

4) The next potential route is through the United States'
Ophelia National Refuge lands and the lands of Elder in Section 9
just north of the plaintiff's subject property. This would require
access from public Highway 452 through Lac Long road on refuge
property and then down Buck's road to the school board's Section 16
lands and is the longest route of those proposed.[19] As mentioned
earlier, the government has never denied the general public access
to Lac Long Road nor has it required a permit[20]. Similarly, it has
not denied access to Buck's road during refuge hours. The distance
across Elder's lands is similar to the distance across Arnouville's
lands (Pug's Road).

Recall that Buck's road (the old Bordelonville road)
historically continued from Section 3 south through Section 10
where it entered the eastern side of Elder's Section 9 lands and
continued south to and through the school board's land in Section
16. The government denied access into Section 10 because of

---

the larger tract west of Lac Long. That, of course, implies that
the most useful part of the land, as it is currently used for
hunting, is the larger, westernmost tract. While this is not
evidence before the court, it was not disputed at the hearing. A
bridge of sorts does exist across Lac Long near the northern
boundary of Section 16; however, it is a makeshift bridge and is,
at best, suitable for ATV's only.

[19] This is true even if Lac Long Road is determined to be
public for purposes of this case or otherwise.

[20] The reason is that numerous other property owners, including
some in holders, live on or near the road whose only access is via
Lac Long Road.

wetlands concerns and that prompted the Elder's lawsuit in this court in 1994. That suit resulted in a settlement in which the dogleg across part of the southern boundary of Sections 3 and 4[21], both owned by the government, was upgraded and the Elders were granted an unrestricted predial servitude along Bucks road and the dogleg in order to gain access to their property. Thus, no-one is seriously suggesting that the refuge-Elder proposed route traverse Section 10.

At the dogleg's intersection with Section 9 belonging to Elder is the gate erected by Elder and which now prevents the school board's access to its lands. Past the gate, on Elder land, the road continues more or less along the boundary between Elder's Section 9 and the government's Section 10 for about a third of a mile (a third of the section line) where it rejoins and continues in a southwesterly direction as the old Bordelonville road, or Buck's road, into and through the school board's property in Section 16 and then on into Section 17 where the burned bridge over Bayou Jeansonne is or was located.

This route utilizes the historical Bordelonville road. Although there has been much analysis and evidence submitted

---

[21] Some of the maps in the record make it appear that the dogleg is located in Sections 9 and 10; however, that is probably not true (see record of Elder Properties, et al v. U. S., docket #94-1408 in this court. In any event, the dogleg is located more or less on the boundary between Sections 3 and 4 on the one hand, and 9 and 10 on the other. The question is academic, for the United States owns 3, 4, and 10 and Elder owns 9.

regarding the relative costs of building or upgrading the various routes, that evidence is of little weight, because it is up to the school board as the dominant estate to determine how much road it needs. LSA–CC Art. 692. Its only obligation is not to damage the servient estate. The evidence shows that, at most, some shaping and limestone would need to be placed on the roadway on the Elder's land.[22]  While Elder's engineer, Willis, estimates the cost to be approximately $59,000, it is not clear that any improvement is actually needed, for the school board claims it was using the road as it is until the time when Elder cut off their access and Elder and it's lessees use the road as it is at the present time. The route utilizes roads already used by the public, Lac Long Road, and, to some extent, Buck's road which is already burdened by a servitude in favor of Elder and their lessees and, like Lac Long road, is regularly maintained by the refuge. No bridges are needed.

An alternative route suggested by Elder is, instead of using the dogleg to access his property, to instead cross Lac Long in Section 3 or 10 to its east side and use what had been the ATV trail  which had been used by the school board at the sufferance of the government after Elder began denying access. This route would, however, require a bridge to be built across to the east side of Lac Long, and then a second bridge to cross back to the larger

---

[22] See affidavit of Frank Willis, Elder's engineer. See also affidavit of Jessie Lachney, the school board's engineer.

tract belonging to the school board. In addition, while there is some evidence that the eastern bank of Lac Long is higher than surrounding land, it is equally clear that the land is still very low, filled with bottomland hardwoods and ferns. That it was thought to be wetlands[23] is the very reason the trail was closed to ATV traffic by the refuge. The route would require trees to be cleared and the building of an entirely new roadway including the two bridges mentioned.

Even if an issue of fact exists as to whether or not the lands are wetlands, the route is circuitous, would require two bridges and construction of an entirely new road and is, therefore, simply not feasible for reasons other than its wetlands status.

<u>Summary</u>

The only two viable options are the Pug's road route and the refuge-Elder route. While there are disagreements as to incidental facts here and there, I find there are no genuine issues of material fact and that judgment should be rendered as a matter of law finding the refuge-Elder route to be the only feasible route. Exceptional circumstances exist why a shorter route is impracticable.

The Elder road already exists and was in use as is when access was denied by Elder. The road provides access to the larger and

---

[23] See affidavit of the refuge manager, Wehrle. To the court's knowledge no formal determination of its wetlands status has been made.

more useful part of Section 16, west of Lac Long. While Lac Long Road and Buck's Road may or may not be public, they are subject to public use (at least to some extent in the case of Buck's road) which makes the circumstances of this case exceptional[24] or extenuating[25]. Buck's road is already burdened with one servitude in favor of Elder as to which there are no restrictions. While it may not be a public road, it is an established historical route to a public road which existed long before the United States purchased its property. Approximately a third of the road as it traverses the Elder property is along the boundary and so does not bisect the Elder property like a road on the Arnouville property would. Importantly, this route gets the school board to the most useful part of its land without the necessity of building a bridge on its land or elsewhere.

On the other hand, utilizing Pug's road bisects the Arnouville property more or less right down the middle, interfering with its farming operations. The route only accesses the smaller and least useful part of the school board's lands and would require a bridge to be built, as well as an entirely new road on Section 16. In addition, improvements to Pug's road would, according to the evidence, be needed, the cost of which were estimated by Frank Willis, Elder's engineer, to be about $113,000. Conversely, the

---

[24] See Davis, supra.

[25] See Watts, supra.

cost he estimated for the Elder road was only about $59,000 (and that assumes the school board *chooses* to improve it for its benefit at all).

Several exceptional circumstances are present in this case. First is the fact that Lac Long road and Buck's road are to some extent subject to public use already. Buck's road is already subject to an unrestricted servitude in favor of the Elder property. Second, the refuge-Elder route is an historical route. See <u>Bouser</u>, supra. Third is the fact that every other route requires that a bridge be built which is expensive, according to the estimates provided to the court. Such a reason is sufficient for rejecting a proposed route. See <u>Tessier v. Medical center of Baton Rouge, Inc.</u>, supra. Finally is the fact that the existing route through the refuge and Elder properties can be used as is where as the Arnouville route requires extensive improvement to Pug's road as well as building a new road and a bridge on the school board's property.

While Elder argues that his road passes close to the only duck hunting lake on the property in the southeast corner of his section, the road cuts off only a very small part of his land and Elder has not suggested an alternate location for that part of the roadway. Utilizing Pug's road would completely bisect the Arnouville property (see <u>Pearson v. Theriot</u>, 534 So.2d 35 (3rd. Cir. 1988) resulting in what may be significant and prohibitively

23

expensive damages which the school board would have to pay with public funds.

In summary, for the foregoing reasons, IT IS RECOMMENDED that the motion for summary judgment by the school board, document number 112, and the motion by Le Chevalier, document number 108 be GRANTED, dismissing it, and that the motion for summary judgment by Elder, document number 72, be DENIED finding that the school board is entitled to judgment imposing a conventional servitude of passage under Louisiana's laws of predial servitudes and its enclosed estates laws twenty feet in width through the property of the United States and along and to the full extent of Lac (Lake) Long Road and Buck's Road (including the dogleg), and through Elder's Section 9 lands to the school board's Section 16 lands. Like the servitude granted in favor of Elder, the servitude should be unrestricted on the lands of the United States and, on the Elder lands, should be subject only to the restriction that the gate be allowed to remain, provided that any lock placed thereon be accessible to the school board and parties claiming rights through it. The Arnouville defendants should be dismissed.

## OBJECTIONS

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have five (5) business days from service of this Report and Recommendation to file specific, written objections with the clerk of court. A party may respond to another

24

party's objections within five (5) days after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the district judge at the time of filing. Timely objections will be considered by the district judge before he makes his final ruling. No extensions of time to object will be granted.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FIVE (5) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this the 30th day of June, 2009.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

